577 A.2d 412

IN THE MATTER OF THE APPLICATION OF VV
PUBLISHING CORPORATION.

Argued May 7, 1990—Decided July 9, 1990.

510

*Gary Wm. Moylen* argued the cause for appellants complaining minor witnesses in a related criminal matter (*Casella, Carducci, McMichael & Moylen,* attorneys).

*Mary Adele Hornish* argued the cause for appellants certain minor children (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski,* attorneys).

*Glenn D. Goldberg,* Assistant Prosecutor, argued the cause for appellant State of New Jersey (*Herbert H. Tate, Jr.,* Essex County Prosecutor, attorney).

*Laura R. Handman,* a member of the New York bar, argued the cause for respondents, VV Publishing Corporation and The New York Times (*Gordon, Gordon & Haley,* attorneys; *Laura R. Handman, Timothy S. Haley,* and *Deborah R. Linfield,* a member of the New York bar, on the brief).

*A.F. McGimpsey, Jr.,* and *Thomas J. Cafferty* submitted a brief on behalf of *amicus curiae,* New Jersey Press Association (*McGimpsey & Cafferty,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

■  In this appeal the underlying substantive issue is whether VV Publishing Corporation (Village Voice) is entitled to receive redacted or unredacted transcripts of a protracted criminal trial involving the alleged sexual abuse of nursery-school children.  The Appellate Division held that either alternative was acceptable, purporting to accord to Village Voice the choice between the two options.  *Application of VV Publishing Corp.*, 230 *N.J.Super.* 86, 93–94, 552 *A.*2d 661 (1989).  At oral argument, the Attorney General and the attorneys for complaining minor witnesses in the criminal trial (Intervenors) informed us that they had read the Appellate Division opinion to confer on the trial court the choice of options.  Confident that the trial court would order the transcripts redacted, neither the Attorney General nor the intervenors appealed from the judgment of the Appellate Division.  The trial court read the opinion as vesting the choice in Village Voice, and consistent with its election ordered that Village Voice be furnished unredacted transcripts, subject to certain conditions designed to protect the identities of children who testified.  The Appellate Division summarily affirmed without clarifying whether its initial opinion left the choice of redacted or unredacted transcripts with the Village Voice or the trial court.  We granted certification.  —— *N.J.* —— (1990).  Because no appeal was taken from the initial judgment of the Appellate Division, the underlying substantive issue is not presented directly on this appeal.  We reach and decide the issue because of its significance to the parties in this proceeding, exercising not only our appellate jurisdiction but also our supervisory authority over the administration of justice, *see, e.g., Rodriguez v. Rosenblatt,* 58 *N.J.* 281, 294, 277 *A.*2d 216 (1971), and our particular responsibility "to take all appropriate measures to ensure the fair and proper administration of a criminal trial." *State v. Williams,* 93 *N.J.* 39, 62, 459 *A.*2d 641 (1983).

## I.

This proceeding is an outgrowth of a widely publicized criminal case, *State v. Margaret Kelly Michaels,* tried in Essex County over a ten-month period in 1987 and 1988. The 115–count indictments charged that Michaels had sexually assaulted a number of three- to five-year-old children while she had been a teacher at a day-care center in Maplewood. The charges generated extensive publicity.

Although the children's testimony was critical to the State's case, many of their parents were reluctant to permit them to testify, expressing understandable concern that their identification as child-sexual-abuse victims might cause future stigma and embarrassment. To accommodate the State's testimonial requirements, the privacy interests of the children and their parents, and the media's first-amendment rights, the trial court allowed the media full access to the trial proceedings but prohibited publication of the names, addresses, or other identifying characteristics of the victims and their families. The trial court also ordered that all transcripts be sealed. The media representatives covering the trial did not object to those restrictions.

No representative of Village Voice attended the trial. Approximately two months after the trial had concluded, Village Voice applied to unseal the transcripts, seeking an unredacted version that contained the names and addresses of the children who testified. Village Voice agreed not to identify the children in any articles dealing with the trial, but contended that it could not reliably report on the trial proceedings without resort to unredacted transcripts. The trial court denied the application, and also rejected an alternative proposal that Village Voice be furnished with transcripts redacted to delete all identifying characteristics of the children and their families.

The Appellate Division concurred with the trial court's finding that "protection of the children's physical and psychological welfare constitutes a compelling state interest," and upheld the

validity of the restrictions imposed by the court on the media in the course of trial. 230 *N.J. Super.* at 93, 552 *A.*2d 661. The court concluded, however, that the trial court's sealing of the trial transcripts was inconsistent with its obligation to consider the "least intrusive alternative" in imposing conditions that restrict media access to criminal trials. *Ibid.* Hence, the court ordered that

> the trial judge should make the following alternatives available to Village Voice or any other legitimate media representative. One alternative is for a court representative to exclude the names, addresses and any identifying characteristics of the victims and their families and provide a redacted version of the transcripts for the media such as Village Voice at the expense of the party requesting the transcripts. The trial judge should also appoint a guardian for the infants to review the redacted version before its release.
>
> The second alternative is for Village Voice to execute a guarantee of non-disclosure and through its own means borrow or otherwise obtain access to an unredacted transcript co-extensive with the restrictions imposed upon all media at the trial. This arrangement does not impose a greater burden on Village Voice than that imposed upon other media during trial, nor does it afford greater rights. [*Id.* at 93–94, 552 *A.*2d 661 (footnote omitted).]

Although the foregoing excerpt from the court's opinion appears to confer the choice of alternatives on Village Voice, the Attorney General and counsel for intervenors rely on the following passage as the basis for their contention that the ultimate choice was left with the trial court:

> Accordingly, we reverse and remand this matter to the trial judge for expedited action consistent with this opinion. The manner in which the transcripts shall be obtained, purchased and redacted is left to the sound discretion of the trial judge. [*Id.* at 94, 552 *A.*2d 661.]

As noted, no appeal was taken from the judgment of the Appellate Division.

At the remand hearing, counsel for intervenors acknowledged that the Appellate Division decision was "written somewhat ambiguously," but disagreed with Village Voice's contention that the trial court was not "left * * * to make the final decision in [its] sound discretion * * *." The trial judge stated categorically that "I would prefer if I felt I could interpret [the Appellate Division decision] that I have the discretion * * *," and also expressed a clear preference for "the first alternative

where it was all redacted * * *," noting that "You don't have to persuade me that the first alternative to me is preferable. It's plain right from the start * * *." Nevertheless, the court construed the Appellate Division decision as leaving the choice between the "alternatives" with the Village Voice. Accordingly, the court ordered that the transcripts be unsealed, but prohibited any media that gained access to the transcripts from publishing the names, addresses, and identifying characteristics of the children and their families. The court also ordered that the newspapers maintain the record in a secure location, restricting access to only those reporters determined to be "journalistically appropriate." Transcripts of all proceedings held *in camera* or at side-bar were to be redacted from the record by an attorney designated by the court.

The State and attorneys for the intervening parents appealed. The Appellate Division summarily affirmed the trial court's order. That affirmance can be understood to determine only that the trial court's order was consistent with the prior judgment of the Appellate Division.

## II.

We are fully in accord with the Appellate Division's articulation of the underlying principles that govern the imposition of limitations on the public's right of access to criminal trials. The basic premise is that there is a constitutionally-protected public right of access to criminal trials that is "implicit in the guarantees of the First Amendment * * *." *Richmond Newspapers v. Virginia,* 448 *U.S.* 555, 580, 100 *S.Ct.* 2814, 2829, 65 *L.Ed.*2d 973, 992 (1980). It is a right that can be overcome only by virtue of an overriding state interest articulated in findings by the court imposing limitations on the right of access. *Id.* at 581, 100 *S.Ct.* at 2829, 63 *L.Ed.*2d at 992.

In *Globe Newspaper Co. v. Superior Court,* 457 *U.S.* 596, 102 *S.Ct.* 2613, 73 *L.Ed.*2d 248 (1982), the Court emphasized the institutional value served by public access to criminal trials:

> Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government. In sum, the institutional value of the open criminal trial is recognized in both logic and experience. [*Id.* at 606, 102 *S.Ct.* at 2619–20, 73 *L.Ed.*2d at 256–57 (footnotes omitted).]

Emphasizing that the right of public access is not absolute, the Court observed that where

> the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest. [*Id.* at 606–07, 102 *S.Ct.* at 2620, 73 *L.Ed.*2d at 257.]

Thus, the Court in *Globe* held unconstitutional a Massachusetts statute that required trial courts, at trials for specific sexual offenses involving a victim under the age of eighteen, to exclude the press and public from the courtroom during the victim's testimony. The Court held that the compelling state interest in protecting the victim's psychological well-being could be vindicated on a case-by-case basis, and did not justify a mandatory closure rule in all such cases. *Id.* at 607–08, 102 *S.Ct.* at 2620–21, 73 *L.Ed.*2d at 258.

The right of access to transcripts of criminal proceedings has been accorded a protected status analogous to the right of access to the trial itself. In *Press–Enterprise Co. v. Superior Court*, 478 *U.S.* 1, 106 *S.Ct.* 2735, 92 *L.Ed.*2d 1 (1986), a California magistrate conducting a protracted preliminary hearing in a highly-publicized murder case closed the proceedings to the public. A newspaper sought but was denied transcripts of the hearing by the California courts. The Supreme Court reversed, observing that "the preliminary hearing is often the final and most important step in the criminal proceeding," *id.* at 12, 106 *S.Ct.* at 2742, 92 *L.Ed.*2d at 12–13, holding that "the qualified First Amendment right of access to criminal proceedings applies to preliminary hearings * * *." *Id.* at 13, 106 *S.Ct.* at 2743, 92 *L.Ed.*2d at 13. Although not explicitly recog-

nizing a constitutionally-protected right of access to transcripts of criminal proceedings, the Court treated the right to transcripts as co-extensive with the right of access to the proceedings. *Ibid.*

Similarly, in an earlier case, *Press–Enterprise Co. v. Superior Court,* 464 *U.S.* 501, 104 *S.Ct.* 819, 78 *L.Ed.*2d 629 (1984), the Court reversed a California decision upholding a trial court's order closing to the public the *voir dire* in a rape-murder trial and sealing the transcript. The Court recognized a right of public access to the *voir dire,* observing that the interests in juror privacy relied on by the trial court did not justify complete closure of the proceedings. *Id.* at 510–11, 104 *S.Ct.* at 824, 78 *L.Ed.*2d at 629. Accordingly, the Court held that on remand only those portions of the transcript relating to protectible juror-privacy interests could be sealed, requiring that the balance of the transcripts be released. *Id.* at 513, 104 *S.Ct.* at 825, 78 *L.Ed.*2d at 640.

The Third Circuit Court of Appeals applied analogous reasoning in *United States v. Martin,* 746 *F.*2d 964 (1984), reversing a district court order denying media representatives permission to copy audiotapes admitted into evidence at the trial of seven former Philadelphia police officers, and also denying access to transcripts of the tapes that had been provided to jurors. The court rejected the district court's reliance on the fact that the transcripts were not in evidence, holding that in view of the "obvious limitations" in requiring the media to rely on the recorded conversations, "[t]he public interest can best be vindicated by the release of complete and accurate transcriptions." *Id.* at 968.

In *State v. Williams, supra,* 93 *N.J.* 39, 459 *A.*2d 641, we held that our state constitution afforded to the press and public "a protectible right to be present during the conduct of criminal pretrial proceedings," *id.* at 59, 459 *A.*2d 641, acknowledging that that right was fully consistent with the right of access to criminal trials protected by the first amendment. *Ibid.* Never-

theless, we recognized in *Williams* that the right of access to pretrial proceedings must be weighed against a defendant's right to a fair trial before an impartial jury. *Id.* at 62, 459 *A.*2d 641. We adopted a balancing test to be applied by trial courts in determining whether closure of pretrial proceedings, or various alternatives to closure, should be employed in order to assure that the impanelling of an impartial jury is not jeopardized. *Id.* at 63–69, 459 *A.*2d 641. Thus, we recognized in *Williams* that notwithstanding the highly protective status we accord to the public's right of access to criminal proceedings, such rights "can conflict with other rights and interests of equal magnitude." *Id.* at 59, 459 *A.*2d 641.

We observed in *Williams* that a source of our authority to limit public access to pretrial proceedings, so as to secure a defendant's right to a fair trial, was the judiciary's "overarching constitutional responsibility to guarantee the proper administration of justice," which imposes an "independent obligation [on] the court to take all appropriate measures to ensure the fair and proper administration of a criminal trial." *Id.* at 62, 459 *A.*2d 641. In that connection, our Court Rules have dealt expressly with issues relating to public access to trials. *See, e.g., R.* 1:2–1 (mandating that trials and other proceedings be conducted in open court unless otherwise provided by Rule or statute); *R.* 3:6–7 (providing for secrecy of grand-jury proceedings); *R.* 3:13–3(d)(2) (authorizing private showing by prosecution to support protective order limiting discovery and inspection by defendant). In addition, Supreme Court guidelines impose limits on television, radio, or still photography coverage of proceedings involving certain sexual offenses and other proceedings involving minor victims of crime. *Guidelines for Still and Television Camera and Audio Coverage of Proceedings in the Courts of New Jersey* § 10.

### III.

We consider the matter before us in the context of both the applicable decisional law and our supervisory authority over the

administration of justice. We are also obliged to consider the strong legislative interest in protecting the identities of minor victims of sexual crimes. Although enacted after the conclusion of the *Michaels* trial, Laws 1989, chapter 336, section 1 (codified at *N.J.S.A.* 2A:82–46), prohibits public disclosure of the name, address, and identity of the minor victim of various sexual offenses, unless authorized by a court for good cause. The statute mandates that all public records of such proceedings refer to the victim by initials or fictitious name, *N.J.S.A.* 2A:82–46a, and authorizes courts to impose further restrictions on disclosure to prevent trauma or stigma to such minor victims. *N.J.S.A.* 2A:82–46d.

■■ It is self-evident that the pretrial order by the trial court, which permitted full media access to the trial on condition that the names, addresses, and identities of the child-victims not be disclosed, was fully consistent with the legislative policy reflected in Laws 1989, chapter 336, section 1. That order was unchallenged at trial, and no issue concerning its validity is asserted in this proceeding. According to the petition for certification, that order was prompted in part by the prosecutor's representation to the trial court that parents of some of the victims would not permit their testimony without an assurance of confidentiality. That potential impediment to the presentation of the State's case coupled with the Court's responsibility to protect child-victims of sexual assault from unnecessary public notoriety afforded ample justification for the court's pretrial order conditioning media attendance at trial on compliance with the court's prohibition against disclosure of the identities of the victims. We emphasize that the court's order did not constitute a prohibited prior restraint on publication of information ascertained at a public trial; the media's presence in the courtroom was subject to the restrictions imposed by the court. *Cf. Oklahoma Publishing Co. v. District Court*, 430 *U.S.* 308, 97 *S.Ct.* 1045, 51 *L.Ed.*2d 355 (1977) (invalidating pretrial order of Oklahoma Juvenile Court prohibiting media that had obtained identity of juvenile defendant in

prior public-court proceeding from publishing juvenile's name and picture); *Cox Broadcasting Corp. v. Cohn,* 420 *U.S.* 469, 95 *S.Ct.* 1029, 43 *L.Ed.*2d 328 (1975) (State may not impose sanctions on media's accurate publication of rape victim's name obtained from judicial records open to public inspection). In the context of the *Michaels* trial, we perceive no conflict between the procedure invoked to protect the childrens' identities and the rights of access to court proceedings protected by the first amendment.

The trial court having assured the prosecutor and indirectly the children's parents that the identities of children who testified for the State would not be disclosed, we can readily understand the basis for that court's unmistakable preference for providing Village Voice with redacted rather than unredacted transcripts. No other media representative has had access to unredacted transcripts. Thus, the trial court was understandably apprehensive that the very existence of such transcripts disclosing the identities of all children who testified at trial, although securely maintained and protected by an order of non-disclosure, would present a serious long-term risk that the transcripts could fall into the hands of media representatives not subject to the court's restrictive order. It is incontrovertible that of the alternative procedures authorized by the Appellate Division, 230 *N.J.Super.* at 93–94, 552 *A.*2d 661, the one contemplating a redacted transcript posed a measurably less-substantial risk of disclosure of the children's identities than the alternative authorizing unredacted transcripts.

In view of the highly sensitive nature of the evidence adduced at trial, the extraordinary media interest in the proceedings, and the compelling state interest both in protecting the identities of the children who testified and in honoring the representation to their parents that disclosure of their children's identities would be barred, we conclude that the procedure for providing trial transcripts to Village Voice and other media should have been entrusted to the trial court. We also

concur with the trial court's view that under these circumstances redacted transcripts are all that Village Voice is entitled to receive.

We acknowledge that the Appellate Division may have intended to confer that discretion on the trial court, but express no view on the issue. However, in the context of this record it would be intolerable to permit the underlying substantive issue to go unresolved by default. The interests at stake are too significant to allow the ultimate disposition of this appeal to be dictated by an apparent misunderstanding of the Appellate Division's initial decision.

The judgment of the Appellate Division is reversed and the matter remanded to the Law Division for further proceedings consistent with this opinion.

CLIFFORD, J., dissenting.

The Court decides the wrong question. Not only that, it decides the wrong question the wrong way. Not only that, in deciding the wrong question the wrong way, it sweeps aside the most basic Rules of appellate practice. Not only that, to implement those jurisprudential indignities it constructs an ambiguity where none exists in an earlier, unappealed decision of the Appellate Division so that it can nourish an apparent irresistible impulse to set aright what it thinks went awry below.

Because of the terribly sensitive nature of the trial's subject matter, the trial court wisely ordered all media representatives in attendance to refrain from publishing the identifying characteristics of the child-victims. The court also sealed the transcript. Access to the trial was otherwise open, and the court's order did not reach any of the many—probably hundreds—of spectators who attended the proceedings, which lasted for more than ten months.

When the *Village Voice*, which had not sent any reporter to observe the trial, applied to unseal the transcript and obtain an

unredacted version for an article or series of articles, the trial court denied the application despite the paper's agreement not to reveal the identity of any of the children. The court also refused to make available a redacted transcript.

On the *Village Voice*'s appeal the Appellate Division gave the newspaper a choice: (a) pay for a court-redacted transcript, the redaction to be reviewed by a guardian for the children; or (b) take an unredacted transcript, subject to a guarantee of nondisclosure. 230 *N.J.Super.* 86, 93–94, 552 *A.*2d 661 (1989). Clear enough. Nor can there be the slightest mystery in the court's instruction a couple of sentences later that "[t]he *manner* in which the transcripts shall be *obtained, purchased and redacted* is left to the sound discretion of the trial court." *Id.* at 94, 552 *A.*2d 661 (emphasis added). The court was obviously saying that whichever alternative *Village Voice* chose, the trial court would oversee the *mechanics* of the acquisition of the transcripts; the Appellate Division was not going to get involved in the supervision of those details. Any perceived ambiguity in the foregoing provision, quoted *ante* at 513, 577 *A.*2d at 414, is sheer invention.

If anyone was upset with the Appellate Division's resolution of the problem, he or she remained silent. No one protested. No one sought to appeal. Not until the *Village Voice* had exercised its choice of alternatives and the trial court had released the transcript, subject to all kinds of protections and conditions and prohibitions, did the State and intervening parents make an emergent application to the Appellate Division. The question then, of course, became whether the trial court's order of release was consistent with the Appellate Division's earlier opinion. Two judges of the panel that had issued the earlier decision had no trouble at all with the appellants' application. They summarily affirmed. So should we.

The only question before us (I have to guess at it because, contrary to the specific mandate of *Rule* 2:12–7(a), the petition for certification contains no statement of the question present-

ed) is whether the trial court's method of releasing the transcript to the *Village Voice* complied with the mandate of the Appellate Division. Indisputably it did. That matter needs no discussion.

That should be the end of it. But it is not. The Court finds a way to resurrect an Appellate Division judgment from which the time to appeal expired lo these many months ago—well over a year ago, in fact. Having resuscitated a dead issue, it overturns that judgment and decides that "redacted transcripts are all that Village Voice is entitled to receive." *Ante* at 519, 577 *A*.2d at 417.

Wholesome and humane as the Court's instincts and motivations surely are, the balance initially struck by the Appellate Division is not so wide of the mark as to warrant this Court's ill-advised activism. In fact, it is not wide of the mark at all. The disposition by the court below was measured, thoughtful, and appropriately considerate of the conflicting privacy rights of the child-victims on the one hand and of the right of access of the public and the media to materials derived from an open criminal trial on the other. If the Court insists on reaching the propriety of that disposition, it would do well to recall that there are much greater risks than having an unredacted transcript in the hands of the *Village Voice*, which has committed itself to not disclosing identifying information—risks about which the trial court, in deciding not to close the courtroom, chose to do nothing and about which this Court can do nothing: an indiscreet former spectator at the trial; a reporter's private notes; or even someone who, having become privy to neighborhood gossip, spreads it without regard to the feelings and well-being of those affected by the remarks. Those risks are included in the sometimes-painful price of a free and open society.

I would affirm.

Justice POLLOCK joins in this opinion.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices HANDLER, O'HERN, GARIBALDI and STEIN—5.

*For affirmance*—Justices CLIFFORD and POLLOCK—2.