60 A.3d 827

## Nos. A–1306–11T4 [1], A–1435–11T4.

HOLLY HALVORSEN, INDIVIDUALLY, AND AS GUARDIAN AD LITEM FOR MICHAEL NASEN, RUSSELL HARRIOTT, JR., AND ALYSSA HARRIOTT, MINORS, PLAINTIFFS–APPELLANTS, v. GREGORY J. VILLAMIL, MARITZA DELGADO, DEFENDANTS, AND METZ & ASSOCIATES, LTD., D/B/A TGI FRIDAYS'S RESTAURANT AND ITS AGENTS, SERVANTS AND/OR EMPLOYEES, BRICK TOWNSHIP PUBS, INC. AND NORTHEAST CONCEPTS, INC., DEFENDANTS–RESPONDENTS.

RUSSELL HARRIOTT, INDIVIDUALLY, AND AS GUARDIAN AD LITEM FOR MICHAEL NASEN, RUSSELL HARRIOTT, JR., AND ALYSSA HARRIOTT, MINORS, PLAINTIFFS–APPELLANTS, v. GREGORY J. VILLAMIL, MARITZA DELGADO, DEFENDANTS, AND METZ & ASSOCIATES, LTD., D/B/A TGI FRIDAYS'S RESTAURANT AND ITS AGENTS, SERVANTS AND/OR EMPLOYEES, BRICK TOWNSHIP PUBS, INC. AND NORTHEAST CONCEPTS, INC., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 15, 2013—Decided March 6, 2013.

---

[1] These appeals originally calendared back-to-back are consolidated for purposes of opinion.

Before Judges REISNER,[2] HARRIS and HOFFMAN.

*Thomas J. Smith, III,* argued the cause for appellant Holly Halvorsen (*Smith & Shaw PA,* attorneys; *Mr. Smith,* on the brief).

*Vincent P. Manning* argued the cause for appellant Russell Harriott (*Manning, Caliendo & Thomson, P.A.,* attorneys; *Mr. Manning,* on the brief).

*Joseph A. Gallo* argued the cause for respondents (*Wilson, Elser, Moskowitz, Edelman & Dicker LLP,* attorneys; *Mr. Gallo,* of counsel and on the brief; *Emily Weisslitz,* on the brief).

The opinion of the court was delivered by

HOFFMAN, J.S.C. (temporarily assigned).

Plaintiffs, who sustained injuries as a result of a motor vehicle accident with a drunk driver, appeal from the June 10, 2011

---

[2] Judge Reisner did not participate in oral argument. However, the parties consented to her participation in the decision.

*R.* 2:13–2(b).

summary judgment dismissal of their dram shop action against defendant Metz & Associates, Ltd. (T.G.I. Friday's).[3] Their appeal presents the question of whether the New Jersey Licensed Alcoholic Beverage Server Fair Liability Act, *N.J.S.A.* 2A:22A–1 to –7, commonly referred to as the Dram Shop Act (the Act), requires eyewitness testimony to prove a person was served an alcoholic beverage while visibly intoxicated. After careful review of the statutory language and applicable case law, we determine that it does not. We further determine that despite the lack of an eyewitness, the record contains sufficient evidence to create a genuine issue of material fact as to whether T.G.I. Friday's served the drunk driver who caused the accident while he was visibly intoxicated. Accordingly, we reverse and remand for further proceedings.

I

The following facts are derived from the motion record. On February 10, 2008, co-defendant Gregory Villamil arrived at T.G.I. Friday's, sometime between the hours of 4:00 p.m. and 7:00 p.m.[4] A woman he knew only as "Stacy," whom he claimed to have met a few weeks earlier while apartment hunting, accompanied him. He picked her up at her home and they drove to T.G.I. Friday's together. According to Villamil, he did not consume alcohol before arriving at T.G.I. Friday's or after leaving. While at T.G.I. Friday's, Villamil said he and Stacy sat at the bar and he consumed "two or three [beers]." When asked if he could describe any of the employees who were working that evening, Villamil replied, "No, I cannot. It's kind of, like, a blur. I don't remember." Villamil said he and Stacy left T.G.I. Friday's twenty

---

[3] Metz & Associates is the corporate owner of the T.G.I. Friday's restaurant in Brick, New Jersey.

[4] When questioned by police in the hospital two days after the accident, Villamil said he went to T.G.I. Friday's at approximately 4 p.m. or 5 p.m. At his deposition taken two years after the accident, Villamil said he went to T.G.I. Friday's between 6:00 p.m. and 7:00 p.m.

to thirty minutes before the accident. Villamil then dropped off Stacy at her home. He did not go inside and immediately began driving to his home.

At approximately 9:00 p.m., Villamil drove his vehicle into the rear of a pickup truck driven by plaintiff Russell Harriott as it slowed to make a right-hand turn. The resulting impact caused the pickup truck to overturn onto its driver's side. Plaintiff Holly Halvorsen and her three children were passengers in the pickup truck. All of the occupants of both vehicles sustained injury in the accident.

At 9:07 p.m., the police arrived at the scene. While removing Villamil from his vehicle, paramedics noticed an odor of alcohol on his breath. The police report indicates that Villamil "had to be extricated from his vehicle and sustained major injuries to his head[,]" and that he "was in and out of consciousness." When asked if he was in pain, he replied "no, I'm fine."

Paramedics transported Villamil to Jersey Shore Medical Center Trauma Unit where the police had a blood sample drawn from Villamil at 10:32 p.m. New Jersey State Police chemists later determined the blood alcohol concentration of the sample was 0.278 percent.

Plaintiffs retained Richard Saferstein, an expert in forensic science, toxicology and alcohol. According to Dr. Saferstein's report, in order for Villamil to reach a blood alcohol concentration of 0.278 percent, he "would have had to consume the equivalent of approximately seventeen [twelve] ounce containers of beer." Dr. Saferstein opined that assuming Villamil did not start drinking until 6:30 p.m., based on Villamil's height and weight, he would have reached a blood alcohol concentration of 0.10 percent by 7:30 p.m., which would have rendered Villamil visibly impaired. Specifically,

[f]rom approximately 7:30 p.m. and until he left TGI Friday's Restaurant, Mr. Villamil would have exhibited increasing physical manifestations and the unmistak[able] signs of alcohol intoxication. Most apparent would have been a significant deterioration in Mr. Villamil's muscular condition that would have resulted in poor body coordination and balance. An unsteady gait, poor balance, slow and

uncertain hand movements, and possible slurred speech are commonly the most obvious behavioral changes in intoxicated people experiencing the blood alcohol levels of Mr. Villamil. In this state of intoxication, Mr. Villamil's condition would have been obvious to individuals who came in contact with him at TGI Friday's Restaurant. A reasonably trained and reasonably perceptive server would have been able to observe Mr. Villamil's visible state of intoxication under these circumstances.

According to Dr. Saferstein, based on Villamil's blood alcohol concentration of 0.278 percent at 10:32 p.m., the amount of time he spent at T.G.I. Friday's, and the accident occurring only a short time after he left the restaurant, "it's reasonable to conclude that while [ ] Villamil was being served alcohol at [T.G.I.] Friday's, he exhibited marked physical manifestations of alcohol intoxication."

Upon completion of discovery, T.G.I. Friday's filed a motion for summary judgment, arguing plaintiffs failed to produce evidence that T.G.I. Friday's served Villamil alcoholic beverages while he was visibly intoxicated, as required by the Act. The motion judge granted T.G.I. Friday's motion, notwithstanding the judge's description of Villamil's level of intoxication as "shocking." The judge found that "[p]laintiffs have not presented any evidence as to what ... Villamil drank or how he behaved at [T.G.I.] Friday's on the evening of the accident." Relying on *Riley v. Keenan,* 406 *N.J.Super.* 281, 967 *A.*2d 868 (App.Div.), *certif. denied,* 200 *N.J.* 207, 976 *A.*2d 384 (2009), and *Salemke v. Sarvetnick,* 352 *N.J.Super.* 319, 800 *A.*2d 177 (App.Div.), *certif. denied,* 175 *N.J.* 77, 812 *A.*2d 1109 (2002), and without considering plaintiffs' expert report in conjunction with the direct and circumstantial evidence of record, the judge determined there was no genuine issue of material fact as to whether T.G.I. Friday's served a "visibly intoxicated person." This appeal followed.

II

We first consider whether the lack of an eyewitness to testify that T.G.I. Friday's served alcohol to Villamil while he was visibly intoxicated is fatal to plaintiffs' claims.

The Act was "designed to protect the rights of persons who suffer loss as a result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server while at the same time providing a balanced and reasonable procedure for allocating responsibility for such losses." *N.J.S.A.* 2A:22A–2.

Pursuant to the Act:

a. A person who sustains personal injury or property damage as a result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server may recover damages from a licensed alcoholic beverage server only if:

(1) The server is deemed negligent pursuant to subsection b. of this section; and

(2) The injury or damage was proximately caused by the negligent service of alcoholic beverages; and

(3) The injury or damage was a foreseeable consequence of the negligent service of alcoholic beverages.

b. A licensed alcoholic beverage server shall be deemed to have been negligent *only when the server served a visibly intoxicated person,* or served a minor, under circumstances where the server knew, or reasonably should have known, that the person served was a minor.

[*N.J.S.A.* 2A:22A–5 (emphasis added).]

The Act defines visibly intoxicated as "a state of intoxication accompanied by a perceptible act or series of acts which present clear signs of intoxication." *N.J.S.A.* 2A:22A–3. However, the Act does not contain language mandating that a plaintiff produce an eyewitness to prove a person was served alcohol by the beverage server while he or she was visibly intoxicated.

In *Mazzacano v. Estate of Kinnerman,* 197 *N.J.* 307, 962 *A.*2d 1103 (2009), our Supreme Court acknowledged that it is possible to prove liability under the Act without direct eyewitness testimony on the visible intoxication issue. In *Mazzacano,* eyewitnesses testified that the person who later drove and caused a fatal accident did not appear visibly intoxicated while he consumed alcohol provided by the defendant social club at a picnic where guests served themselves beer from a tap. *Id.* at 312, 962 *A.*2d 1103.[5] Writing for the Court, Justice Albin explained:

---

[5] The main issue in *Mazzacano* was the Act's applicability to the self service of alcohol. Specifically, the Court rejected the argument that the trial court should

It was the jury's task to decide what weight, if any, to give to the testimony of the witnesses at the Pig Roast and the expert testimony. *Had there been no testimony concerning Kinnerman's condition at the picnic, the jury might well have been persuaded that Dr. Pandina's testimony was sufficient to prove the Club's negligence.* Ultimately, the jury determined that the Club did not negligently provide alcoholic beverages to Kinnerman when he was visibly intoxicated.

[*Id.* at 321, 962 *A.*2d 1103 (emphasis added).]

Based on *Mazzacano* and the absence of an eyewitness requirement in the statutory language, we do not read such a requirement into the Act. The Court's explanation for rejecting the imposition of a duty to monitor alcohol consumption in a self-service situation guides us to reject the imposition of an eyewitness requirement:

We cannot, and should not, rewrite a plainly-written enactment of the Legislature or write in an additional qualification which the Legislature pointedly omitted. Our duty is to construe and apply the statute as enacted. We have previously stated that there is a fine line between interpreting statutory language and engrafting a judicial standard over that language.

[*Id.* at 323, 962 *A.*2d 1103 (internal quotation marks and citations omitted).]

A fact may be proved by both direct evidence and circumstantial evidence. *State v. Phelps,* 96 *N.J.* 500, 511, 476 *A.*2d 1199 (1984). "Both direct and circumstantial evidence are equally acceptable forms of proof. Indeed, circumstantial evidence may be deemed more certain and satisfying than direct evidence." *Newmark–Shortino v. Buna,* 427 *N.J.Super.* 285, 312, 48 *A.*3d 401 (App.Div.2012) (citations omitted). To defeat a motion for summary judgment in a dram shop case, a plaintiff must present sufficient direct or circumstantial evidence that would permit a jury to reasonably and legitimately deduce that a beverage server served alcoholic beverages to the person at issue while he or she was visibly intoxicated. *See Salemke, supra,* 352 *N.J.Super.* at 327, 800 *A.*2d 177.

---

have instructed the jury that the Club had a responsibility to monitor alcoholic consumption at the picnic. *Id.* at 322, 962 *A.*2d 1103.

III

■ Having determined the lack of an eyewitness is not fatal to plaintiffs' claim, we now consider whether the evidence plaintiffs presented in opposition to defendant's motion for summary judgment was sufficient to create a genuine issue of material fact as to whether Villamil was served an alcoholic beverage by T.G.I. Friday's while he was visibly intoxicated.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2(c). The determination of whether there is a genuine issue of material fact should be made viewing all relevant evidence and reasonable inferences "in the light most favorable to the non-moving party." *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995). Our review of a trial court order granting summary judgment is de novo and we apply the same standard as the trial court in determining whether there are any genuinely disputed issues of material fact. *Prudential Prop. & Cas. Ins. Co. v. Boylan*, 307 *N.J.Super.* 162, 167, 704 *A.*2d 597 (App.Div.), *certif. denied*, 154 *N.J.* 608, 713 *A.*2d 499 (1998).

■ Plaintiffs presented the following evidence on the visible intoxication issue. Villamil testified at his deposition that he did not consume alcohol before going to T.G.I. Friday's or after leaving, and that the accident occurred only twenty minutes after he left T.G.I. Friday's.[6] The police report documents erratic driving by Villamil when he struck a slowing vehicle in the rear with sufficient impact to cause it to flip on its side. When the police and paramedics arrived at the accident scene, they smelled

---

[6] We have found that a driver's manner of driving after leaving a bar may be probative of the driver's condition while at the bar, depending on the time interval that has elapsed. *Truchan v. Sayreville Bar and Rest., Inc.*, 323 *N.J.Super.* 40, 51, 731 *A.*2d 1218 (App.Div.1999).

alcohol on Villamil's breath. Additionally, Villamil told the police he was not in pain, despite the paramedics reporting that he sustained serious bodily injuries requiring hospitalization. Finally, Villamil's blood taken at the hospital revealed the very high blood alcohol concentration of 0.278 percent.

Dr. Saferstein's expert opinion bolstered this evidence. He opined that based on Villamil's height and weight, Villamil would have reached a blood alcohol concentration of 0.10 percent by 7:30 p.m., an hour before the time Villamil claimed to have left T.G.I. Friday's. According to Dr. Saferstein, in order to reach a blood alcohol concentration of 0.278 percent, Villamil "would have had to consume the equivalent of approximately seventeen [twelve] ounce containers of beer." Thus, Dr. Saferstein concluded that he could determine within a reasonable degree of scientific certainty that T.G.I. Friday's served Villamil an alcoholic beverage while he was visibly intoxicated.

We recognize that in other cases we have found the evidence presented insufficient to create a genuine issue of fact regarding visible intoxication. In *Riley, supra,* the plaintiffs brought a dram shop liability claim against two bars as a result of injuries sustained when a drunk driver crashed into their vehicle. 406 *N.J.Super.* at 287, 967 *A.*2d 868. A toxicology report revealed the drunk driver's "blood alcohol level to be .178 at 10:10 p.m., one hour and twenty five minutes after the accident." *Id.* at 288, 967 *A.*2d 868. The drunk driver had no recollection of how many drinks he had at the first bar, what time he left, or ever going to the second bar. *Id.* at 299–301, 967 *A.*2d 868. There was no eyewitness to testify whether the drunk driver was served alcohol at the second bar while he was visibly intoxicated. *Id.* at 300–01, 967 *A.*2d 868.

Following a trial, the jury found both bars partially liable. *Id.* at 287–88, 967 *A.*2d 868. The second bar moved to set aside the verdict. *Id.* at 288, 967 *A.*2d 868. The trial court denied the motion and we reversed. *Id.* at 297–301, 967 *A.*2d 868. Specifically, on the issue of visible intoxication, we found "the expert

testimony was not specific to [the drunk driver], and did not consider either his personal condition or circumstances." *Id.* at 300, 967 *A.*2d 868. Additionally, there was no proof the defendant was ever served at the second bar, let alone that he was there while visibly intoxicated. *Ibid.*

In *Salemke, supra,* the plaintiff's decedent was served alcoholic beverages at a nightclub prior to sustaining fatal injuries in a car accident later the same night. 352 *N.J.Super.* 319, 800 *A.*2d 177. " 'Last call' at the bar was at 12:45 a.m. and no alcoholic beverages were served after that time." *Id.* at 322, 800 *A.*2d 177. The decedent and a friend left in a car from the nightclub around 1:00 a.m., with the decedent driving. *Ibid.* The decedent drove the car into a concrete divider, killing herself and injuring her friend. *Id.* at 323, 800 *A.*2d 177. Testing revealed the decedent's blood alcohol concentration was 0.167 percent and she had a brain alcohol level of 0.129 percent. *Ibid.* No eyewitness observed the decedent being served alcohol while visibly intoxicated. *Id.* at 324, 800 *A.*2d 177.

Dr. Saferstein prepared an expert report for the plaintiff and opined that based on the decedent's weight, her brain alcohol level would have been over 0.10 percent after 12:50 a.m., a level at which an average individual would appear visibly intoxicated. *Ibid.*

The trial court granted summary judgment in favor of the nightclub. *Ibid.* We affirmed, finding the plaintiff did not provide sufficient evidence to prove the nightclub served the decedent an alcoholic beverage while she was visibly intoxicated. *Id.* at 327, 800 *A.*2d 177. Specifically, Dr. Saferstein's report indicated that the defendant would not have begun to manifest signs of visible intoxication until after last call. *Ibid.*

We find the facts of this matter readily distinguishable from *Riley* and *Salemke.* Unlike *Riley,* here we have statements of Villamil that he was actually served an alcoholic beverage at T.G.I. Friday's. Moreover, Dr. Saferstein estimated Villamil started drinking at 6:30 p.m., within the time Villamil claimed he arrived

at T.G.I. Fridays. Dr. Saferstein opined that if Villamil started drinking earlier than 6:30 p.m., he would have appeared visibly intoxicated sooner.[7] Unlike *Salemke,* Dr. Safertein's report in this matter had Villamil manifesting signs of visible intoxication while Villamil claimed to be at T.G.I. Friday's, and while the restaurant was still serving him alcoholic beverages.

We do not conclude that Dr. Saferstein's expert report alone creates a genuine issue of material fact on the visible intoxication issue. We do conclude, however, that Dr. Saferstein's opinions, when combined with the direct and circumstantial evidence of record—Villamil's testimony that he only drank alcoholic beverages at T.G.I. Friday's, the short time period between Villamil leaving T.G.I. Friday's and his erratic driving that caused the accident, Villamil telling paramedics he felt no pain despite sustaining serious injuries, and Villamil's extremely high blood alcohol content—would allow a jury to reasonably and legitimately deduce that T.G.I. Friday's served Villamil an alcoholic beverage while he was visibly intoxicated. We find the record sufficient to create an issue of fact for the jury to resolve.

Reversed and remanded.

---

[7] The jury may conclude that Villamil's drinking at T.G.I. Friday's began much earlier, in light of his high blood alcohol content and the statement he gave to police within two days of the accident indicating that he arrived between 4:00 p.m. and 5:00 p.m.